HOUSE *v.* CLEMENS *et al.*

(*Common Pleas of New York City and County, Special Term.* January, 1890.)

INJUNCTION—BREACH OF CONTRACT—CERTAINTY.

On a motion to restrain the performance of a play, being a dramatization of a work by defendant C., which had been dramatized and produced by the other de-

fendants, it appeared that, plaintiff having suggested to C. that his work could be successfully dramatized, the latter wrote him: "That would be nice, but I cannot dramatize it. * * * But you could do it, and, if you will take one-half or two-thirds of the proceeds, I wish you would. Shan't I send you the book?" Plaintiff replied: "I should be well pleased to undertake the dramatization. * * * Shall be glad if you will send me a copy of the book," etc. Subsequently plaintiff read or gave C. a portion of the work, and, as he claimed, was directed to complete it. This was denied, but it was not suggested that plaintiff was told to abandon the work. *Held,* that the correspondence showed a contract definite and certain, and one which could be specifically performed by C., and that, it appearing that the other defendants had notice of plaintiff's rights, the motion would be granted.

Action by Edward H. House to restrain the performance of a play known as "The Prince and the Pauper," being a dramatization by the defendant Abby Sage Richardson of the book or novel of that name, written by the defendant Samuel L. Clemens, and in course of production on the stage by defendant Daniel Frohman.

*Morgan & Ives,* for plaintiff.    *Alexander & Green,* for defendant Clemens. *Howe & Hummel,* for defendants Frohman and Richardson.

DALY, J.    The plaintiff, who is an author of experience and familiar with the art of constructing plays, suggested to the defendant Clemens that the latter's book or novel called "The Prince and the Pauper" could be successfully dramatized, and the latter wrote to the plaintiff on December 17, 1886, a letter in which he said: "You have spoken of ' The Prince and the Pauper ' for the stage. That would be nice, but I cannot dramatize it. The reason I say this is because I did dramatize it, and made a bad botch of it; but you could do it, and if you will take one-half or two-thirds of the proceeds I wish you would. Shan't I send you the book?" On the 24th of December, 1886, the plaintiff wrote to Mr. Clemens a letter, saying: "As regards ' The Prince and the Pauper,' I should be well pleased to undertake the dramatization of it. I shall be glad if you will send me a copy of the book. According to my remembrance of the book, the most taking stage arrangements would be to give both characters to the same performer, using a silent double in positions where they must for a moment appear together. If there is anywhere about a girl like what Lotta was twenty years ago, or Bijou Heron fifteen years ago, she might fill the duplicate part; but for such selection and other business details you know I am now incompetent. Doubtless there are plenty of trustworthy men to take that matter in hand. In a day or two I shall have finished work on a libretto for a comic opera I have had to write, and shall be ready for fresh fields and pastures new." On the 26th of December, 1886, Mr. Clemens wrote to the plaintiff: "I've ordered a copy of P. and P. to be sent to you. I've done up my absurd P. and P. dramatization, and will express it to you to-day or to-morrow." The plaintiff says that subsequently Mr. Clemens came to New York, and it was then agreed that plaintiff was to receive at least one-half of the proceeds, and when it should be deemed expedient to put the play upon the stage deponent was to take such active part in the business arrangement as his physical condition would permit. Plaintiff has been for more than ten years an invalid, and for seven years confined to his bed or a chair. Plaintiff states that he wrote several letters in April and May, 1887, to Mr. Clemens, giving his reflections on the work of dramatization of the play, and concerning the proper person to perform the principal characters; also stating from time to time what progress he had made in the work. That on the 13th of June, 1887, he had completed the first act, and read it to Mr. Clemens, who expressed himself pleased with it, and in the same month it was agreed between them that deponent should proceed without delay, and finish the play as rapidly as possible. In August, 1887, plaintiff wrote to Mr. Clemens that he had the satisfaction of seeing the whole five acts completed, with the single exception of the last scene of the fifth act, and two weeks afterwards stated to Mr. Clemens that the play was ready at any

time, and that he wished to hear from Clemens at his convenience. Subsequently, and up to January, 1889, he had conversations with Clemens in which he endeavored to interest him in the subject of the play, and its performance, but without success. That in February, 1889, he wrote to Mr. Clemens of a rumor he had heard that the latter was occupying himself with the dramatization of one of his books, and calling his attention to the business of "The Prince and the Pauper." Having had no reply to this letter, that he wrote again on the 25th of February, 1889, again calling Mr. Clemens' attention to the dramatization of "The Prince and the Pauper." That on February 26, 1889, he received a letter from Mr. Clemens containing the following: "I gather the idea from your letter that you would have undertaken the dramatization of that book. Well, that would have been joyful news to me about the middle of December, when I gladly took the first offer that came, and made a contract. I remembered that you started once to map out the frame-work for me to fill in, and I suggested to this lady that possibly you would collaborate with her, but she thought she would do the work alone. However, I never thought of such a thing as your being willing to undertake the dramatization itself. I mean the whole thing. I will look in when I come down." On April 17, 1889, the defendant Frohman called on the plaintiff, and told him he was about to produce a dramatization of "The Prince and the Pauper," written by the defendant Mrs. Richardson under a contract with Mr. Clemens. That deponent thereupon notified Frohman of his claim to the exclusive right to dramatize the book. The dramatization by Mrs. Richardson, under the authority of Mr. Clemens, was performed in Philadelphia by Mr. Frohman's company on the 24th day of December, 1889, and is being played at this time in the city of New York. In this dramatization the principal characters of "The Prince and the Pauper" are performed by one person, as suggested by the plaintiff, and it is also claimed by the latter that a particular scene invented by him is used in the play now performing.

The defendant Clemens does not deny the writing of the letter of December 17, 1886, first above referred to, in which he proposes the dramatization, but declares that he is not able, not having kept a copy of the letter, to say whether the extract given by the plaintiff is correct or not. He produces in full the plaintiff's reply, dated December 24, 1886, which is in these words, so far as this particular matter is concerned: "MY DEAR MARK: As regards 'The Prince and the Pauper,' I should, of course, be well pleased to undertake the dramatization of it, though why you imagine I should be able to make a better piece of work than I can I do not understand. In any case, I hope you would let me see your version, as I might discover at the very start that I could not do so well. You would have to bear in mind that even if I should achieve a play of superlative and unprecedented merit, I am in no condition to look after its acceptance and production, i. e., the business part of the production. Managers are all of a new generation. Though I know the sort of persons required for properly acting such a piece, I don't know where such persons are to be found, nor whether they exist. According to my remembrance of the book, the most taking stage arrangement would be to give both characters to the same performer, using a silent double in positions where they must for a moment or two appear together. If there is anywhere about a girl like what Lotta was twenty years ago, or Bijou Heron fifteen years ago, she might fill the duplicate part; but for such selection and other business details you know I am now incompetent. Doubtless there are plenty of trustworthy men to take that matter in hand; so I shall be able, if you will send me a copy of the book, the commonest copy you have, as I shall use it roughly, (Koto will be delighted, as she has never read it, considering her choice copy as too good to be cut open.) In a day or two I shall finish work on a libretto for a comic opera I have got to write, and I shall be ready for fresh fields and pastures new."

The defendant regards the foregoing as a qualified acceptance of the proposition to dramatize the work. He says that he sent the plaintiff the books and his own dramatization, and that he had some further conversation with the plaintiff about it, but it was very general; that he has no recollection of receiving any letter or letters from the plaintiff reporting his progress in the work of its completion; that the plaintiff wrote an outline or skeleton of the first act, with, perhaps, a little of the dialogue, and brought it to him to fill in; that he did not use the language attributed to him, nor anything like it, at the reading of the play, and that nothing was said about completing the work; that he did not agree to fill in the play, and that the matter dropped between him and the plaintiff; that the plaintiff was only to try his hand at a dramatization, and he never gave him any exclusive right to dramatize the work, and never agreed to do anything, or write anything, in conjunction with him; that no contract was made or ratified between them; that after the receipt of the letter of December 24, 1886, he did not think plaintiff could do much in the way he desired, and did not obligate him to do it, nor obligate himself to allow plaintiff to do it; that, after the skeleton or outline of the first act was brought to him, (in June, 1887,) he never heard of it again until after he had given the defendant Mrs. Richardson permission to dramatize the book, and did not know plaintiff was engaged upon a dramatization, but wrote to Mrs. Richardson that plaintiff had done some work, and asked her to see him, and perhaps they could collaborate, but this she declined to do, saying she could do the work herself. He produces two letters from plaintiff of March and April, 1887, referring to the plaintiff's proposed visit to defendant in June, 1887, in which no mention is made of the dramatization. It was upon this visit that the plaintiff gave or read to him the first act of the proposed play, or the outline of the first act.

From the statement of both parties, it is manifest that Mr. Clemens made a distinct proposition to plaintiff to dramatize the work, and that the latter accepted it, and that this was in writing on both sides,—in their respective letters of December 17 and December 24, 1886; and that in June, 1887, plaintiff read or gave to defendant a portion of the work. The plaintiff says he was directed by defendant to go on and complete it. This is denied, but it is not suggested that plaintiff was instructed to abandon it. Mr. Clemens held his own views as to plaintiff's being able to do what he had undertaken, but it is manifest that plaintiff proceeded, and completed it. Whether the letters reporting progress were received or not is a question of fact, which need not be determined in order to arrive at a conclusion as to the rights of the parties. There were some conversations which defendant characterizes as general, but the substance of which he does not give. Plaintiff is very precise in his account of them. In the multitude of professional work pressing upon so busy and popular an author as Mr. Clemens, much may have escaped his recollection that would not be forgotten by an invalid like the plaintiff, confined to his bed or his chair, and conceded to be a man of methodical habits in recording the details of his correspondence or conversations. The plaintiff's positive recollection might be regarded as satisfactory evidence on these points, if opposed to the defendant's want of recollection.

But, if nothing had been said or written by plaintiff to Mr. Clemens about the progress of the work after June, 1887, it in no way affected the rights of the parties based upon the original proposition and its acceptance. This acceptance is said to be qualified, but I do not think it may be justly so considered. The plaintiff expresses himself with modesty as to the results of his undertaking, but this is, perhaps, but the conventional self-disparagement of conscious merit. It probably did not mislead an author as experienced · as Mr. Clemens, who is himself not given to boasting of results before he has achieved them. There being, as I have said, a definite proposition made, and an acceptance and a contract thus entered into, the plaintiff could go on with

his part of the work, and there was no need to say or do anything further until the discovery of a suitable person to perform the principal parts in the play. Everything depended upon finding such a person. The plaintiff suggests it at the outset, and the defendant does not question it. Time was not essential in the performance of the contract. No time was fixed for plaintiff to complete the play, and no demand was made upon him for performance. The period that elapsed between the contract in December, 1886, and the date when Mr. Clemens made his arrangement with Mrs. Richardson, in December, 1888, even if plaintiff had not in the mean time written nor spoken to Mr. Clemens about the work, would not affect the rights of the parties. It certainly was not so great as to efface from the mind of the defendant the fact that the plaintiff had been at work on the play, for he mentioned the circumstance to Mrs. Richardson, and suggests her collaborating with the plaintiff. It would not warrant the inference that plaintiff had abandoned the work.

There being a contract between the parties which has never been rescinded, the question is whether the plaintiff is entitled to enforce it in the way he seeks; that is, by injunction against performances by the defendant Clemens, and the defendants Mrs. Richardson and Mr. Frohman, of any dramatization of the book except that prepared by the plaintiff. It is contended by the defendant Clemens that this contract is materially deficient and uncertain, and incapable of being carried into effect without the court making another and further agreement for the parties; that it does not specify when, where, or how the play is to be written or performed; and therefore it cannot be spesifically enforced; and that, if plaintiff prevents a performance of the play now acting, there is no certainty that the one he has written can be acted. I think the contract definite and certain, and capable of being carried into effect. Although it does not provide for all the details, it is probable that no more definite contract could have been made at the time. It contemplated the finding of a person to play the part, and of a manager to produce the play. In the nature of things, no specific time could be fixed for either occurrence. If a further and other contract were necessary when these things should concur, yet the original agreement could be enforced.

In the case of *England* v. *Curling*, 8 Beav. 129, certain persons, desiring to enter into a copartnership, caused a draft of their agreement to be prepared, and signed it with their initials, not intending it as a final agreement, nor as containing all details, but contemplating the preparation and execution of a formal copartnership deed. Such a.deed was drawn, but never executed, because the parties could not agree upon all of its provisions; yet they went on and began business, though the full arrangement of details was never completed. The court enforced the agreement to the extent of enjoining one copartner from entering into business with other persons during the partnership term, although it was conceded, in the language of the court, to be "impossible to make persons who will not concur carry on a business jointly for their common advantage." It was also held to be of no consequence that the details of the business had not been agreed upon, because, as the court says, "a copartnership agreement is open to variation by the parties from day to day." What could better describe the state of the agreement between these parties, Mr. House and Mr. Clemens? From the nature of their projected undertaking, any agreement that they made as to details was likely to be varied from time to time, and any stipulations as to such details might, therefore, properly be left to the future. If the contract between plaintiff and defendant is one which can be specifically performed by the latter, then the plaintiff is entitled to maintain an action to compel such performance, if he has no adequate remedy at law. That the contract can be specifically performed is conclusively shown by the arrangement which Mr. Clemens has made with Mr. Frohman for putting Mrs. Richardson's dramatization upon

the stage, performances under such arrangement having been for some time past successfully given. That the plaintiff has no adequate remedy at law is clear. An action for damages will afford him no relief. It would not be possible to ascertain what sum plaintiff should have for a breach of the defendant's contract. There is no basis for estimating what profits would accrue from the performance of plaintiff's dramatization, and therefore no basis exists for computing damages. It is undoubtedly true that the court cannot practically enforce the performance of this contract by compelling defendant to put plaintiff's dramatization on the stage; but where the remedy by injunction will do substantial justice, by obliging the defendant to carry out his contract or to lose all benefit of the breach, equity can thus enforce it. In the case of *Singer Manuf'g Co.* v. *Union Button-Hole, Etc., Co.*, 6 Fish. Pat. Cas. 480, the subject was fully discussed. In that case defendant's company was the owner of a patent for machines for making button-holes, and had a factory for turning out such machines. In order to secure a market for their product, they made a contract with the plaintiffs, constituting them exclusive agents for the sale of these machines, and agreed to furnish plaintiffs with them, as called for, up to the full capacity of the factory, at an agreed price, After the plaintiffs had bought and paid for a thousand machines, and had succeeded at much labor and expense in selling them and creating a demand, the defendants became dissatisfied with their own bargain, and refused to deliver any more machines to plaintiffs, and began measures to dissolve their association so as to evade their contract, and they conveyed all their patents to a third party as trustee for another association. The court (U. S. Cir. Dist. Mass.) entertained a suit brought by plaintiffs to compel defendants to perform their contract, and to enjoin them and the third party (who knew of plaintiffs' rights) from manufacturing machines, except for the plaintiffs. It was broadly stated in the decision that, even if the plaintiffs were not entitled to a decree for specific performance, if the court could not order a contract for the making of button-hole machines to be specifically performed by reason of the impossibility of superintending the details of such a business, yet an injunction to restrain the manufacture of such machines for other persons than the plaintiffs might be ordered. The court cited the cases of *Lumley* v. *Wagner*, 1, De Gex, M. & G. 616, where a singer was enjoined from singing at another theater, although there was no way to oblige her to sing at the plaintiff's theater, where she was under contract; and the case of *De Mattos* v. *Gibson*, 4 De Gex & J. 276, where the use of a ship contrary to the charter agreement was enjoined; the case of *Hooper* v. *Brodrick*, 11 Sim. 47, where, although the court could not force the defendant to keep an inn on certain demised premises, as he had agreed to do, it enjoined him from doing anything to prevent such use; the cases of injunctions against actors, authors, and publishers, where specific performance of contracts could not be enforced except by injunction, (*Webster* v. *Dillon*, 5 Wkly. Rep. 867; *Stiff* v. *Cassell*, 2 Jur., N. S., 348;) and the case of *Dietrichsen* v. *Cabburn*, 2 Phil. Ch. 52, in which defendant, who had appointed plaintiff his wholesale agent for the sale of his patent medicine, and agreed to supply him with all he ordered at 40 per cent. discount, was enjoined from selling to any others. The court held it to be established that if the remedy at law is inadequate, and the case is one in which the negative remedy of injunction will do substantial justice between the parties, by obliging the defendant either to carry out his contract, or lose all benefit from the breach of it, and there is no reason of policy against it, the court will interfere to restrain conduct which is contrary to the contract, though it may be unable to enforce a specific performance. The doctrine was considered established in *Montague* v. *Flockton*, L. R. 16 Eq. 189, and followed in this country in *Daly* v. *Smith*, 38 N. Y. Super. Ct. 158, and since in many cases, so that it is no longer open to question. In *Glassington* v. *Thwaites*, 1 Sim. & S. 124, plaintiff, who was a partner with defendants in the

publication of a newspaper called the "Morning Herald," sued to restrain the use by defendants for a rival publication, "The English Chronicle," in which they alone were interested, of the effects of the former copartnership. The court said: "The principles of courts of equity would not permit that parties bound to each other, by express or implied contract, to promote an undertaking for the common benefit, should any of them engage in another concern which necessarily gave them a direct interest adverse to that undertaking."

Upon these authorities the right of the plaintiff to an injunction restraining Mr. Clemens from engaging in or promoting or authorizing the performance of a dramatization (by any other person than the plaintiff) of "The Prince and the Pauper" is clear, because such action on defendant's part is adverse to the joint undertaking between him and the plaintiff for the writing and production of a dramatization of defendant's book. It is shown that Mrs. Richardson and Mr. Frohman, the other defendants, had sufficient notice of the plaintiff's rights to entitle the latter to include them in the injunction against Mr. Clemens. Mrs. Richardson was informed by Mr. Clemens that the plaintiff had done some work upon the play, and this was sufficient to put her upon inquiry. Defendant Frohman appears to have been expressly informed of plaintiff's rights. In the agreement made by the defendants among themselves for the production of Mrs. Richardson's dramatization there is a stipulation concerning possible claims on the part of any other person, and it is evident they contemplated the plaintiff's claim, and none other. The motion for an injunction should be granted, with $10 costs.